IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 16-33469 |
| | § | Case No. 16-33470 |
| THERMA-FLITE, INC. *et al.*, | § | |
| | § | (Chapter 7 Cases) |
| Debtors. | § | |
| | § | **<u>Hearing Date</u>: September 1, 2016** |
| | § | **at 1:00 p.m. (Central Time)** |

**<u>CFC, INC.'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY</u>**

**THIS IS A MOTION FOR RELIEF FROM THE AUTOMATIC STAY. IF IT IS GRANTED, THE MOVANT MAY ACT OUTSIDE OF THE BANKRUPTCY PROCESS. IF YOU DO NOT WANT THE STAY LIFTED, IMMEDIATELY CONTACT THE MOVING PARTY TO SETTLE. IF YOU CANNOT SETTLE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY AT LEAST 7 DAYS BEFORE THE HEARING. IF YOU CANNOT SETTLE, YOU MUST ATTEND THE HEARING. EVIDENCE MAY BE OFFERED AT THE HEARING AND THE COURT MAY RULE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY. THERE WILL BE A HEARING ON THIS MATTER ON <u>SEPTEMBER 1, 2016 AT 1:00 P.M.</u> IN COURTROOM 400, 515 RUSK, HOUSTON, TX 77002.**

COMES NOW CFC, Inc. ("<u>Lender</u>"), the primary lender of Therma-Flite, Inc. (the "<u>Debtor</u>" and, together with the Lender, the "<u>Parties</u>") and a substantial secured creditor in the above-styled bankruptcy cases (collectively, the "<u>Bankruptcy Case</u>"), and files this its *Motion for Relief from the Automatic Stay* (the "<u>Motion</u>"), together with the *Declaration of Hans H. Morkner* (the "<u>Declaration</u>") in support of the relief sought herein, a true and correct copy of which is attached to this Motion as <u>Exhibit "A"</u> and is incorporated herein for all intents and purposes, respectfully stating as follows:

## I. PROCEDURAL BACKGROUND

1. On July 8, 2016, (the "Petition Date"), the Debtor and its affiliated debtors (together with the Debtor, the "Debtors") filed their respective voluntary petitions for Chapter 7 relief in accordance with title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, (the "Bankruptcy Code").

2. This Court has jurisdiction over the Bankruptcy Case and the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b)(2). The statutory basis for the relief sought in this Motion is section 362(d) of the Bankruptcy Code.

## II. FACTUAL BACKGROUND

### A. $3 MILLION MASTER LOAN AGREEMENT

3. Prior to the Petition Date, in February 2015, Lender, a small family loan fund, was contacted by a local bank to gauge Lender's interest in making a loan to the Debtor. At that time, Debtor was a local California company that appeared to have sufficient collateral for the total amount it sought to borrow. After reviewing the Debtor's history, Lender made the decision to loan the Debtor up to $3 million (the "Loan") as set forth in the terms of that certain *Master Agreement* entered into by the Parties on April 23, 2015. Attached as Exhibit "1" to the Declaration is a true and correct copy of the *Master Agreement*. The terms of the *Master Agreement* are incorporated by way of reference into this Motion for all intents and purposes.

4. Specifically, Lender agreed to make the Loan to the Debtor under the terms of that certain *Promissory Note*, a true and correct copy of which is attached to the Declaration as Exhibit "2" and its terms are incorporated into this Motion by way of reference. The Parties further agreed the Loan would be secured by Debtor's collateral as set forth in the *Master*

*Agreement* and as provided by the terms of the Parties' *Security Agreement* and *Factoring Agreement*, both of which are also dated April 23, 2015. True and correct copies of the *Security Agreement* and *Factoring Agreement* are attached to the Declaration as Exhibit "3" and Exhibit "4" respectively. The terms of the *Security Agreement* and *Factoring Agreement* are incorporated into this Motion by way of reference for all intents and purposes.

5. Because Lender's due diligence review was not yet complete, and because Lender nevertheless wanted to start disbursing Loan funds to the Debtor but only in a manner that would ensure Lender's first-priority security interest in particular collateral of the Debtor, the Parties agreed Lender would disburse Loan funds to the Debtor through the following three (3) advancements:

i. $1 Million Accounts Receivable and Mobile Unit Advancement: a loan up to $1 million secured by Debtor's accounts receivable held by the Debtor pursuant to the terms of that certain *Factoring Agreement*, which further required the Debtor to assign its accounts receivable to Lender; in accordance with the terms of the *Factoring Agreement*, the Debtor could thereafter "substitute" new accounts receivable and/or a particular machine of interest known as the "Mobile Unit" with the Debtor's remaining initial accounts receivable without the Debtor having to pay down the loan, provided the new "substituted" collectively satisfied certain requirements, such as having a collective value of at least $2.5 million (of which at least $500,000.00 had to be accounts receivable less than 120 days aged); alternatively, the Debtor must pay down the loan by an amount that would provide Lender with a loan-to-value ratio of at least $1 (loan balance) to $2.5 (collateral value). A true and correct copy of Lender's UCC financing statement, properly filed on May 18, 2015 with the California Secretary of State's Office, is attached to the Declaration as Exhibit "5" and is incorporated herein by reference for all intents and purposes. This UCC financing accurately lists Lender's collateral as including, without limitation, Debtor's accounts receivable, machinery, equipment, and intellectual property.

ii. $1.5 Million Arkansas Real Property & Equipment Advancement: a loan up to $1.5 million, secured by Debtor's building (the "Arkansas Real Property") and equipment (the "Arkansas Equipment") located at 2524 Champagnolle Rd., El Dorado, Arkansas; the terms of the conveyance to and attachment of the lien interests of Lender in Debtor's Arkansas Real Property are set forth

in the *Master Agreement* and that certain *Mortgage* between the Parties, recorded on April 30, 2015 in Union County, Arkansas. A true, correct, and file-stamped copy of the *Mortgage* is attached as Exhibit "6" to the Declaration, the terms of which are incorporated in this Motion by reference for all intents and purposes; the terms of the conveyance to and attachment of the security interests of Lender in Debtor's Arkansas Equipment are set forth in the *Master Agreement* and the *Security Agreement*. A true and correct copy of Lender's record (produced and maintained in the ordinary course of Lender's business) of its proper filing of its UCC financing statement with the Arkansas Secretary of State on May 19, 2015 is attached to the Declaration as Exhibit "7". The properly filed UCC financing statement correctly lists as Lender's collateral as including, without limitation, Debtor's machinery, equipment, and accounts receivable, in addition to Debtor's intellectual property.

iii. $500,000.00 Remaining Equipment Advance: a loan up to $500,000.00 secured by the balance of Debtor's equipment (the "Remaining Equipment"); the terms of the conveyance to and attachment of the security interests of Lender in Debtor's Remaining Equipment are included in the *Master Agreement* and *Security Agreement*. In addition to the UCC financing statements perfecting Lender's first-priority security interests in Debtor's personal property located in California and Arkansas, attached as Exhibit "8" to the Declaration is a true and correct copy of a UCC financing statement correctly filed with the Texas Secretary of State's Office on February 24, 2016, which perfects Lender's security interests in, among other things, Debtor's equipment, tools, supplies, intangible property, and accounts receivable in Texas.

Altogether, the principal amount of the Loan, comprised of three (3) separate advances and governed by the Loan Documents, totaled $3 million, not including applicable interest and fees.

## B. $400,000.00 BRIDGE LOAN

6. On August 18, 2015, the Parties entered into that certain *Amended Loan Agreement*, whereby the *Master Agreement* was amended after Lender agreed to make a $400,000.00 bridge loan (the "Bridge Loan") to the Debtor (in excess of the Loan for $3 million in principal). Under the terms of the *Amended Loan Agreement*, Debtor was required to pay 9% interest per annum with outstanding interest paid to Lender each month, with the payment of the entire principal balance of the Bridge Loan and any outstanding accrued interest becoming due

and payable on December 15, 2015. As collateral for the Bridge Loan, Debtor conveyed to Lender, among other things, a security interest in the Debtor's computer and technology servers, its ERP (i.e., enterprise resource planning software), and related general intangibles and intellectual property. At the time, Lender's California and Arkansas UCC financing statements had been filed and were effective. Not very much later, Lender's Texas UCC financing statement was filed and in effect. A true and correct copy of the *Amended Loan Agreement* is attached to the Declaration as Exhibit "9" and its terms are hereby incorporated into this Motion by reference for all intents and purposes.

7. Thereafter, the Parties entered into that certain *Second Amendment to Loan Agreement*, pursuant to which the Parties amended the *Master Agreement* a second time by further extending the maturity date for Debtor to pay any outstanding principal balance of the Bridge Loan and unpaid accrued interest and fees from December 15, 2015 to January 15, 2016.

### C. $1 MILLION ACCOUNTS RECEIVABLE & MOBILE UNIT ADVANCEMENT

8. After the Parties entered into the original *Master Agreement*, *Promissory Note*, *Security Agreement*, *Factoring Agreement*, and *Mortgage* (collectively, with the California, Arkansas, and Texas UCC financing statements and as later amended or modified, the "Loan Documents"), Lender made a $1 million Loan advancement to the Debtor, with Debtor's outstanding accounts receivable and the Debtor's "Mobile Unit" serving as collateral. While the *Master Agreement* and *Factoring Agreement* contemplated the initial collateral to be entirely made up of Debtor's accounts receivable (with the Mobile Unit possibly being later paired with Debtor's new unencumbered accounts receivable to serve as "substituted" collateral), the Mobile Unit was ultimately included in the initial collateral package because the value of the Debtor's accounts receivable alone was determined to be insufficient to justify the full $1 million

advancement.

9. In deciding the inclusion of the Debtor's Mobile Unit in the initial collateral package would shore up the insufficiency presented by using the Debtor's accounts receivable alone, Lender justifiably believed the Debtor's Mobile Unit was fully constructed and operational. Regardless of whether Lender's erroneous beliefs about the Mobile Unit's status and condition was intentionally caused by the Debtor in order to secure an advance for the maximum possible amount, Lender relied heavily upon its misinformation when it agreed to advance Loan funds to the Debtor for the full $1 million because the Mobile Unit had been made a substantial part of the collateral package. Lender only later discovered the Debtor had yet to complete its construction of the Mobile Unit, and, as result, the Mobile Unit had yet to become operational. Rather than the Mobile Unit being fully assembled and functioning, its state at that time comprised of some partial assemblies and numerous parts yet to be included in any assembly at all, let alone an assembly capable of being recognized as a component of what ultimately may be a fully constructed and operational Mobile Unit.

10. The Parties consequently reached an understanding that a sale of the Debtor's business, including the sale of a substantially assembled Mobile Unit, would be optimal way for the Debtor to pay off the Bridge Loan and the primary Loan. With that aim, the Parties entered into that certain *Third Amendment to Loan Agreement*. Pursuant to the terms of that agreement, the Debtor promised, among other things, it would substantially complete its construction of the Mobile Unit at its own expense (estimated then to be approximately $600,000.00) on or before June 30, 2016 in order to facilitate a sale. The Debtor also agreed to increase its annual interest rate from 9% to 12%, and, if successful in selling its business on or before the primary Loan comes due, Debtor also agreed to pay Lender an additional fee, taking into account Lender's lost

opportunity cost, equal to 2% of the then outstanding Loan balance. In return, Lender consented to a further extension of the maturity date for the Debtor to pay off the Bridge Loan's principal balance and unpaid accrued interest and fees from January 15, 2016 to the earlier the Debtor's business is sold or December 31, 2016.

**D. $1.5 MILLION ARKANSAS REAL PROPERTY & EQUIPMENT ADVANCEMENT**

11. After the Parties entered into the original Loan Documents, Lender also made a $1.5 million Loan advancement to the Debtor, with the Debtor's Arkansas Real Property and Arkansas Equipment serving as Lender's collateral. In connection with Lender's $1.5 million Loan advancement, the Parties entered into, signed, and then recorded the Mortgage on April 30, 2015 in Union County, El Dorado, Arkansas. As a result, Lender properly perfected its first priority lien interests in the Arkansas Real Property. Similarly, Lender properly filed its Arkansas UCC financing statement with the Arkansas Secretary of State's Office on May 19, 2015, thereby perfecting Lender's security interests in the Arkansas Equipment, among other collateral.

**E. $500,000.00 REMAINING EQUIPMENT ADVANCEMENT**

12. Similarly, after entering into the original Loan Documents, Lender made a $500,000.00 Loan advancement to the Debtor, with the Remaining Equipment serving as collateral for the Lender in the event the Debtor was unable to pay off the $500,000.00 principal amount of the advance, plus any unpaid accrued interest and fees. Because the Debtor properly filed its UCC financing statements, including, but not limited to the financing statements filed with the Secretary of State's Offices in California and Texas, Debtor has properly perfected its security interests in the Remaining Collateral.

**F. DEFAULTS**

13. Notwithstanding any efforts by the Debtor to effectuate a sale, in the end the Debtor was unable to consummate an agreement obligating the Debtor to sell its business and/or its Mobile Unit to a willing and able buyer for a price acceptable to both parties. And, beginning in April 2016, Debtor defaulted under the terms of the Loan Documents when it stopped making monthly payments to the Lender.

14. On June 3, 2016, Lender, through its counsel, demanded Debtor either: (a) provide Lender with adequate information confirming Debtor has maintained a 4-to-10 collateral value to loan balance ratio by providing Lender with sufficient accounts receivable or other substituted collateral, as is required by paragraph 4.2 of the *Factoring Agreement*; (b) pay down the loan balances sufficient to maintain the *Factoring Agreement's* required 4-to-10 collateral value to loan balance ratio if Debtor lacks sufficient accounts receivable or substituted collateral to maintain the same; or (c) in the event Debtor is not capable of (a) or (b), then it immediately cease and desist all use of accounts receivable and its proceeds, start collecting accounts receivable and its proceeds for the benefit of payment to Lender, and begin segregating all accounts receivables and its proceeds in a separate account named and maintained for the benefit of Lender. Debtor, however, ignored the demand letter sent by Lender and instead continued to intentionally deplete and convert Lender's property. A true and correct copy of the Lender's letter demanding the Debtor cease and desist its intentional abuse of accounts receivable and its proceeds is attached to the Declaration as Exhibit "10" and is hereby incorporated herein for all intents and purposes.

15. On or about July 28, 2016, the undersigned counsel for Lender was informed by Ms. Rhonda R. Chandler, counsel of record in the Bankruptcy Case for the Chapter 7 trustee,

Janet Northrup, (the "Trustee") that Debtors failed to maintain insurance on any property, including property constituting Lender's collateral, such as the Mobile Unit, the Arkansas Real Property, the Arkansas Equipment, the Remaining Equipment, Debtor's computer and technology servers, Debtor's enterprise software program, general intangibles, intellectual property, tools, and supplies. Ms. Chandler further made clear that the Trustee has no intention of using Estate funds in order to reinstate Debtor's insurance. Finally, Ms. Chandler informed the undersigned counsel that it was unknown if any former employees, agents, vendors, partners, subordinated secured creditors, or former landlords of the Debtor had taken any steps to protect against any losses, damages, or theft of Debtor's property, wherever located, that doubled as Debtor's collateral, including, without limitation, Debtor's accounts receivable, proceeds, the Mobile Unit, the Arkansas Real Property, the Arkansas Equipment, the Remaining Equipment, Debtor's computer and technology servers, Debtor's enterprise software program, general intangibles, intellectual property, tools, and supplies.

## III. ARGUMENTS AND AUTHORITIES

16. Under such exigent circumstances where Lender is the uncontroverted, properly perfected first-security-interest holder in most, if not all, of the Debtor's significant personal property, including, without limitation, Debtor's accounts receivable, the Mobile Unit, the Arkansas Equipment, the Remaining Equipment, Debtor's computer and technology servers, Debtor's enterprise resource planning software, general intangibles, intellectual property, tools, and supplies, as well as the properly perfected first-lien holder in the Arkansas Real Property, the Lender has at least two separate avenues for relief from stay in this Bankruptcy Case (a) cause and (b) Debtor's lack of equity in Lender's collateral where Debtor is seeking Chapter 7 liquidation, not pursuing a Chapter 11 reorganization.

17. Section 362(d) of the Bankruptcy Code provides that, upon a motion made by a party-in-interest in a bankruptcy case:

> (d) . . . and after notice and a hearing, the court shall grant relief from the [automatic stay], such as terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such property in interest;
> >
> > (2) with respect to [the automatic stay relating to] an act against property . . . if—
> >
> > > (A) the debtor does not have any equity in such property; and
> > >
> > > (B) such property is not necessary to an effective reorganization.

11 U.S.C. §§ 362(d)(1)-(2) (2016).

18. In the Bankruptcy Case at bar, Lender has sufficient "cause," including the lack of available adequate protection, to justify the modification or termination of the automatic stay with respect to the Lender, such that Lender may locate and take possession of its collateral, take whatever steps are necessary to ensure the collateral is protected against any further risk of loss or damage, and move forward with its state law remedies, including, without limitation, exercising one or more foreclosure sales to generate proceeds to pay off the balances owed by the Debtor on the primary Loan and Bridge Loans.

19. According to the Debtor's own bankruptcy schedules, Lender is a creditor with an undisputed, fixed, and liquidated secured claim against the Debtor of not less than $3.4 million whose collateral is worth significantly less than its secured claim. Under such circumstances, with the exception of the occasional personal property lessor's ownership interest or equipment manufacturer's purchase-money security interest, Lender's claims will be undersecured but

nevertheless superior to claims of other creditors, including, but not limited to, Bank of the West, the Trustee, XPV Water Fund LP, Historic Arsenal Park 1, or any other landlord wishing to foreclose on Debtor's property on account of a mere landlord's lien. However, the Lender's security and lien interests in Debtor's properties are at real risk of suffering a significant diminution in value as a result of Lender's collateral not being insured, supervised, or protected against potential losses or damages.

20. More so in this case than others, there is a very real risk Lender's collateral is suffering significant depreciation or loss of value where the collateral is not insured by the Debtor or the Trustee, and there is no knowledge of anyone being charged with making sure Lender's collateral is not being stolen or vandalized. The potential for depreciation in the value of Lender's collateral in turn has nearly a dollar-for-dollar impact on the resulting diminution of any security or lien interest of the Lender in the very same collateral. The Arkansas Real Property and Arkansas Equipment, for example, are believed to be nearly abandoned and their current condition is completely unknown. Under such circumstances, where there may also be theft and vandalism, it is certainly conceivable that Lender's security and lien interests in that particular collateral could be suffering significant diminution equal to thousands of dollars each day the automatic stay prevents Lender from taking steps to maintain and protect it before exercising its state law remedies.

21. Since the Bankruptcy Case is a Chapter 7 case, in which the Trustee is reluctant to use Estate funds to reinstate Debtor's insurance coverage (in the event collateral is lost or damaged), it is extremely unlikely Lender will receive adequate protection payments from the Trustee or any other party-in-interest in the Bankruptcy Case to help Lender mitigate against any potential loss it is suffering by way of a diminishing security or lien interest in property.

Because the Lender is at real risk of suffering significant diminution in the value of its security and lien interests in its collateral, where its collateral is neither being insured or protected against any losses or damages, and because the Lender is unlikely to receive any form of adequate protection by a party-in-interest to mitigate against potential diminution, there is substantial cause for this Bankruptcy Court to grant the Debtor relief from the automatic stay.

22. Likewise, the Court should modify or terminate the automatic stay on account of the Debtor not having any equity in Lender's collateral and being unnecessary to an effective reorganization. As mentioned, both the Lender and the Debtor's bankruptcy schedules purport Lender's secured claim is not less than $3.5 million. The Debtor's bankruptcy schedules, however, list the Debtor's entire property value at approximately $1,997,000.00—nearly $1.5 million less than Lender's secured claim of $3.5 million. Accordingly, based on the Debtor's bankruptcy schedules alone, the Debtor has no equity in any of its property. And since the Bankruptcy Case is a Chapter 7 liquidation, the Debtor has no need to use the collateral to effectuate a successful reorganization of its business.

23. Because the Debtor's bankruptcy schedules themselves show the Debtor does not have any equity in the property it owns, and because the Debtor's intentions in commencing this Bankruptcy Case is to liquidate any remaining property of the Estate, not to use Lender's collateral for purposes of effectuating a reorganization, this Court should terminate or modify the stay with respect to the Lender so the Lender can take the necessary steps to protect its collateral against any further losses or damage.

## IV. <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED, Lender respectfully requests that this Court enter an order (i) granting this Motion, (ii) finding cause exists for modifying or terminating the

automatic stay as against the Lender or, alternatively, the stay should be modified or terminated with respect to the Lender because the Debtor lacks equity in Lender's collateral, and such collateral is unnecessary for an effective reorganization of the Debtor, (iii) allowing the Lender to take such reasonable and necessary steps to locate, possess, and secure its collateral and exercise its state law remedies, including, but not limited to foreclosure, and (iv) providing Lender such other and further relief to which it is justly entitled.

RESPECTFULLY SUBMITTED, this 2nd day of August 2016,

**GLAST, PHILLIPS & MURRAY, P.C.,**

By: _/s/ Jonathan L. Howell_
Jonathan L. Howell, PLLC
Texas Bar No. 24053668
jhowell@gpm-law.com

14801 Quorum Drive, Suite 500
Dallas, Texas 75254
Telephone: (972) 419-7196
Facsimile: (972) 419-7839

**ATTORNEYS FOR CFC, INC.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that, on or about July 28, 2016, he had phone discussions with counsel for the Chapter 7 trustee, Ms. Rhonda R. Chandler, who confirmed that, given the facts of this Bankruptcy Case, the Chapter 7 trustee is unlikely to oppose Lender's request for relief from the automatic stay where the collateral appears to be in three (3) different states and the Chapter 7 trustee does not intend on reinstating any of the Debtor's insurance policies. Ms. Chandler, however, made clear she would want the opportunity to review Lender's Loan Documents before making a final decision.

By: _/s/ Jonathan L. Howell_
Jonathan L. Howell, PLLC

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this 2nd day of August 2016, he hereby caused the foregoing Motion, its Declaration, exhibits to the Declaration, and proposed order to be served on all parties receiving electronic notice via the Court's CM/ECF system and on each party listed on the attached service list through U.S. first-class mail, postage prepaid.

By: *Jonathan L. Howell* *(/s/)*

Jonathan L. Howell, PLLC